# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NOBLE ROMAN'S, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:17-cv-1415-WTL-DLP** |
| | ) | |
| HATTENHAUER DISTRIBUTING | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the Plaintiff's motion for partial summary judgment and the Defendant's motion for summary judgment. The motions were briefed in Cause No. 1:14-1734-WTL-DML, and supplemental briefs were filed in this case. All citations to the record in this Entry refer to the record in Cause No. 1:14-1734-WTL-DML unless otherwise noted. The Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** both motions for the reasons and to the extent set forth below.

## I. APPLICABLE STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). When the Court reviews cross-motions for summary judgment, as is the case here, "we construe all inferences in favor of the party against

whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted). "'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND FACTS

Unless otherwise noted, the following background facts of record are undisputed. Additional facts are included in the Discussion section.

### A. The Franchise Agreements

Defendant Hattenhauer Distributing Company ("Hattenhauer") owns and operates 21 gas stations and associated convenience stores. Relevant to this case are two of the stores, one located in Goldendale, Washington, and the other in Biggs Junction, Oregon. In April 2005, Hattenhauer signed a five-year agreement with the Plaintiff, Noble Roman's, Inc., ("Noble Roman's") to operate a pizza franchise at its Oregon Location. In August 2006, Hattenhauer signed ten-year agreements with Noble Roman's to operate both a pizza franchise and a Tuscano's sub sandwich franchise at its Washington Location. On March 21, 2011, the parties renewed the franchise agreement for the Oregon location. With one exception, discussed below,

all of the franchise agreements are identical in all material respects. The Court will refer to them collectively as the "Franchise Agreements."

The Franchise Agreements were drafted by Paul Mobley, Noble Roman's Executive Chairman and CFO.

The Franchise Agreements require Hattenhauer to pay Noble Roman's "a continuing weekly royalty fee ('Royalty Fee') in the amount of seven percent (7%) of the Gross Sales of the [Noble Roman's or Tuscano's] . . . for all of the franchised locations." *See e.g.*, Dkt. No. 1-1 at 4.[1] "Gross Sales" is defined as

> the total selling price of all products and services and all income of every other kind and nature related to [the Noble Roman's or Tuscano's franchises], whether for cash or credit and regardless of collection in the case of credit, but expressly excluding sums representing sales taxes collected directly from customer, based upon present or future laws of federal, state or local governments, by [Hattenhauer] in the operation of the [Noble Roman's or Tuscano's franchises], and any other tax, excise or duty which is levied or assessed against [Hattenhauer] by any federal, state, municipal or local authority, based on sales of specific merchandise sold at or from [Noble Roman's or Tuscano's franchises].

*Id.* at 5. "Gross Sales" also includes "all proceeds from the sale of coupons, gift certificates or vouchers . . . provided that the retail price thereof may be credited against Gross Sales during the week in which such coupon, gift certificate or voucher is redeemed for the purpose of determining the amount of Gross Sales upon which the Royalty Fee . . . if any, is due." *Id.*

The Franchise Agreements require Hattenhauer to

> maintain during the term of this Agreement, and shall preserve for at least five (5) years from the dates of their preparation, full, complete, accurate books, records and accounts, including, but not limited to, daily sales records, sales slips, coupons, purchase orders, payroll records, check stubs, bank statements, monthly sales tax records and returns, cash receipts and disbursements, journals and ledgers in accordance with generally accepted accounting principles.

---

[1]Throughout this Entry, the Court will only cite to the Franchise Agreement contained at Docket Number 1-1, rather than to all four agreements, except where it is necessary to distinguish between the agreements.

*Id.* at 16. The Franchise Agreements also provide that "[Noble Roman's] or its designee shall have the right at all reasonable times to review, audit, examine and copy the books and records of [Hattenhauer] as [Noble Roman's] may require at the Noble Roman's Pizza [location]." *Id.* at 17.

Pursuant to the Franchise Agreements, "[i]f any required royalty payments to [Noble Roman's] are delinquent, or if an inspection should reveal that such payments have been understated in any report to [Noble Roman's], then [Hattenhauer] shall immediately pay to [Noble Roman's] the amount overdue or understated upon demand with interest determined in accordance with the provisions of Section IV.B.(3)." *Id.* That section, in turn, provides:

> All unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the 'prime rate' then currently established by the largest bank (determined by total bank assets) headquartered in the state in which the [Noble Roman's and/or Tuscano's] Location is situated.

*Id.* at 5.

### B. Facts Relating to Use of Non-Conforming Pizza Cheese

Pursuant to its agreements with Noble Roman's, Hattenhauer was required to use ingredients approved by Noble Roman's in its franchises. This included Noble Roman's proprietary pizza cheese, which is a blend of mozzarella and Muenster cheese and dry oregano. Noble Roman's Food Preparation and Product Specifications states that "Noble Roman's Pizza Cheese is a custom blend and cut of real Mozzarella and real Muenster cheese with dry oregano added. ***All items used must be Noble Roman's Inc. approved***." Dkt. No. 159-2 at 2 (emphasis in original).

In 2010, Noble Roman's changed its approved distributor for Hattenhauer's locations to McDonald Wholesale Company ("McDonald"). Between August 2010 and approximately

August 2014, Hattenhauer did not purchase Noble Roman's proprietary cheese for its Oregon location, although it continued to purchase Noble Roman's proprietary cheese from McDonald for its Washington location. For its Oregon location, Hattenhauer purchased other types of pizza cheese from McDonald during this time period, including Golden California brand pizza cheese.[2] McDonald sent Noble Roman's monthly reports of the sales it made to Noble Roman's franchisees; the reports indicated that Hattenhauer's Oregon location was purchasing Golden California cheese and was not purchasing Noble Roman's proprietary cheese.

On August 23, 2012, Noble Roman's sent Greg McPeters, one of its franchise managers, to Hattenhauer's locations for training. Noble Roman's did not create an inspection report for these visits. McPeters did not tell Hattenhauer to stop using cheese other than Noble Roman's propriety cheese. No Noble Roman's representative has conducted training at or inspected Hattenhauer's franchise locations since 2012.

In 2014, Noble Roman's conducted an audit of Hattenhauer's locations. The audit revealed that the Oregon Location had not purchased Noble Roman's specified cheese since as early as 2010 and was instead purchasing non-conforming cheese during that time.

### C. Facts Relating to Inspections and Audits by Noble Roman's

From time to time, Noble Roman's visited Hattenhauer's Locations and completed checklists titled "Unit Evaluations" or "Opportunities Assessments" ("Inspection Reports") to monitor Hattenhauer's compliance with the Franchise Agreements. Specifically, Inspection

---

[2]Noble Roman's takes umbrage at Hattenhauer's use of the term "Substitute Cheese" for the other types of pizza cheese it purchased, calling its use of the term "a misleading and false characterization." Dkt. No. 177 at 4. The Court frankly is not sure why Noble Roman's finds the term objectionable. Hattenhauer did, in fact, substitute the other types of pizza cheese for Noble Roman's proprietary cheese blend, so the term seems to be accurate. The Court does not read "Substitute Cheese" as implying that Noble Roman's approved of the substitution or as implying that the different cheeses were fungible.

Reports were completed for the Oregon location only on September 6, 2006; for the Washington location only on July 12, 2010, and for both locations on July 14, 2007, January 16, 2009, and October 8, 2009. The Inspection Reports state that Hattenhauer reported its sales and royalties accurately. Several of the Inspection Reports noted Hattenhauer's discount pricing and value meals. The September 6, 2006, Inspection Report for the Oregon location noted that Hattenhauer was "[e]xperiencing serious distributor problems" and was "[c]onstantly out of sauce, pizza crust and pastas." Dkt. No. 162-4 at 4.

In 2009, Noble Roman's conducted an audit of each of Hattenhauer's locations and created "Sales & Purchases Comparison" reports ("SPCs"). Noble Roman's determined that Hattenhauer had underreported its sales by 32.9% at the Oregon Location and by 34.7% at the Washington location. Noble Roman's did not tell Hattenhauer that it had conducted audits for its locations in 2009. The first time Hattenhauer learned about the 2009 audits and resulting SPCs was during discovery in this lawsuit.[3]

In 2014, Noble Roman's decided to conduct audits of its non-traditional franchisees who paid a royalty fee based on reported sales. This included both of Hattenhauer's locations.

Noble Roman's audits relied on a review of the records of Hattenhauer's purchases from the approved distributor, McDonald. Noble Roman's describes the process as follows:

---

[3]Noble Roman's asserts that these facts are in dispute. See Dkt. No. 177 at 4 ("The facts are not established as to whether or not Hattenhauer received information concerning the audit that Noble Roman's performed on Hattenhauer's franchises in 2009 . . . [or] whether the 2009 audits were first discovered by Hattenhauer during discovery in this lawsuit."). However, Hattenhauer has submitted a declaration supporting them, and the only evidence Noble Roman's points to as disputing them is the deposition testimony of Mitchell Grunat, in which Grunat makes it very clear that he has no recollection of whether he spoke to anyone at Hattenhauer regarding the 2009 audits. This testimony clearly is not sufficient to create an issue of fact regarding whether Hattenhauer had knowledge of the 2009 audits prior to this lawsuit in the face of its declaration that it did not.

In the audit, Noble Roman's reviewed Hattenhauer's purchases, from the distributor's records, of the pizza crusts and other key ingredients, made an allowance for reasonable waste of products, and calculated the amount of sales that would be generated from those purchases. Noble Roman's based its calculations on its operating standards and specifications and decades of experience in the pizza business,[4] then comparing that to the reported sales.

Dkt. No. 159-1 ¶ 15. Noble Roman's did not review the books and records maintained by Hattenhauer or attempt to verify the accuracy of the information contained in the distributor's reports on which it relied. Noble Roman's methodology calculates an amount of sales that Hattenhauer's locations would be expected to make; in other words, it is an estimate.

In Noble Roman's opinion,[5] using this methodology is both appropriate and necessary because of the nature of non-traditional franchises:

In convenience stores, products are periodically assembled and baked throughout the day and placed in a multi-tiered warmer surrounded by a Noble Roman's warmer wrap that identifies the brand for a grab-n-go service style. Customers take the pizza and other items that they want to purchase from the warmer, along with anything else in the store they want to buy, to the counter where the sales of all of their purchases are rung up in the same cash register. By the very nature of this system, and location inside a convenience store that sells numerous items, there are a lot of opportunities for errors in tracking sales by specific items. If the items do not all get rung up there are no records of un-rung item sales to audit. Moreover, pizza could be mistakenly rung up as grocery items instead of a Noble Roman's product purchase. Since no records, such as sales tickets or invoices are kept, no records exist to audit for this problem. For these reasons and others, Noble Roman's had to use alternative methods to audit the reported sales for accuracy in locations such as Hattenhauer's.

---

[4]The record does not indicate the extent of Noble Roman's experience with non-traditional franchise locations.

[5]The factual assertions made by Noble Roman's relating to the appropriateness of Noble Roman's audit methodology and the necessity of using it are supported by Mobley's declaration. Hattenhauer is correct that these assertions are expert opinions, as they are based on Mobley's specialized knowledge. *See* Fed. R. Evid. 701, 702 (defining difference between expert and lay opinion testimony); Dkt. No. 186 at 3 (Noble Roman's explaining that "Last, as a Certified Public Accountant and experienced auditor, Mr. Mobley has personal knowledge about the generally accepted ways of auditing for accurate reporting of sales."). However, the Court need not consider Hattenhauer's argument whether these assertions should therefore be stricken, because they are not material to the Court's ruling. The Court includes them herein because they are necessary to an understanding of Noble Roman's arguments.

Dkt. No. 159 at 4-5.

The methodology used by Noble Roman's does not take into account ingredients that were purchased by Hattenhauer but never used because they were damaged in shipping, handling, or preparation. For example, McDonald's reports reflected credits to Hattenhauer, at least one of which was not accounted for in the audit. Noble Roman's methodology also used a standard "sales mix," which is the percentage of various types of products sold (e.g. 60% of pizzas sold have one topping). The sales mix used by Noble Roman's in its audits was not the actual sales mix in Hattenhauer's locations; rather, Noble Roman's used the same sales mix for its audits of all of its non-traditional franchise locations. Similarly, Noble Roman's used waste allowances of 2%, 3%, or 5% for its audits; it did not attempt to determine what Hattenhauer's actual waste was, as Hattenhauer was not required to—and did not—include that information in the weekly sales reports it sent to Noble Roman's.[6] Hattenhauer's locations had a larger amount of waste than the allowances used by Noble Roman's because it kept its warmers stocked with product, as instructed by Noble Roman's, and had to discard product that was not sold after the applicable holding times. The audits did not take into account the inventory Hattenhauer had at the end of the audit period; that is, Noble Roman's calculated how much Hattenhauer should have sold based upon the ingredients purchased by Hattenhauer, but did not consider whether

---

[6]Hattenhauer states the following in its statement of undisputed facts (and in a supporting declaration): "In 2014, Hattenhauer sent Noble Roman's weekly reports regarding the amount of waste incurred at its franchises." Dkt. No. 161 ¶ 59; Dkt. No. 162-1 ¶ 23. Hattenhauer does not provide any additional information regarding these reports, so it is unknown whether they were prepared and sent each week of 2014 regarding the waste for that week, prepared in previous years and simply provided to Noble Roman's in 2014, or created in 2014 but applied to a broader time period. In other words, the Court cannot discern from the record the amount of data regarding waste that Hattenhauer provided to Noble Roman's or how Hattenhauer acquired the data.

Hattenhauer could have used some of the purchased ingredients for products sold after the audit period. Noble Roman's auditor did not have a complete list of Hattenhauer's menu prices and estimated some of the prices he used for his calculations. Hattenhauer also changed its menu prices over time and sold products for less than full price due to value meals, coupons, frequency cards, specials, and other promotions.

Noble Roman's methodology assumed a constant menu price for each item. Noble Roman's also considered only one menu item for each "core ingredient." For example, its methodology assumed that each "Par 7 Dough" purchased by Hattenhauer was used for a small pizza. However, Hattenhauer also used the pizza dough to make Cinnamon Rounds, which were sold for less than small pizzas. Similarly, tortillas were used for both breakfast burritos and chicken wraps, but Noble Roman's methodology assumed that each tortilla purchased was used for a chicken wrap, which had a higher menu price than a breakfast burrito.

Hattenhauer's cash registers automatically create daily records of sales of Noble Roman's products, called Z tapes and/or register tapes. Hattenhauer creates and maintains records of its sales, including its sales of Noble Roman's products. It also maintains boxes of years of daily station reports, including manual daily reports, manual shift reports, points of sale shift close reports, and other miscellaneous reports by day. Indeed, as set forth above, the Franchise Agreements require Hattenhauer to maintain extensive records, and there is no allegation that it failed to do so.

### D. Facts Relating to Electronic Withdrawals

Based upon its audits, Noble Roman's concluded that Hattenhauer's Oregon location had underpaid royalties between January 2011 and February 2014. On April 1, 2014, without giving prior notice to Hattenhauer, Noble Roman's attempted to electronically withdraw $8,573.79 from

Hattenhauer's bank account to cover the unpaid royalties it had calculated. This attempted transfer was rejected by Hattenhauer's bank.

On April 3, 2014, Noble Roman's informed Hattenhauer by telephone that it had audited the Oregon location and determined that Hattenhauer had underreported its sales from January 2011 to February 2014. On April 4, 2014, Noble Roman's again attempted to electronically withdraw funds for the Oregon location; this time $8,623.79, which was the original amount plus $50. Noble Roman's added the $50 based on a provision in the Franchise Agreements that provided:

> Franchisee shall report its Gross Sales by facsimile transmission or, if not reasonably available, by telephone or by such other method as Franchisor may reasonably direct, by noon on Monday (Eastern Standard Time) ("Due Date") after the end of each week or at such other times as are established by Franchisor in its sole discretion. Franchisor will then deposit or transfer the reported amounts due into its own account, using the Franchisee's pre-authorized check agreement. If any draft, electronic or otherwise, is unpaid because of insufficient funds or otherwise, then Franchisee shall pay the resulting bank fees imposed on Franchisor plus a $25 administrative fee.

Dkt. No. 1-4 at 5. Hattenhauer and Hattenhauer's bank rejected this second attempted transfer.

On April 11, 2014, Noble Roman's sent Hattenhauer an email that stated that Noble Roman's had conducted an audit of Hattenhauer's Washington location for January 2011 to February 2014, and concluded that Hattenhauer owed Noble Roman's $14,125.93 in unpaid royalties. Noble Roman's stated that it had initiated a draft from Hattenhauer's account for that amount. That same day, Hattenhauer informed Noble Roman's by email that it would not allow any funds to be withdrawn from its account without authorization from Hattenhauer. On April 14, 2014, Hattenhauer and its bank rejected Noble Roman's attempted transfer of $14,125.93. On April 16, 2014, Noble Roman's attempted to withdraw the $14,125.93 amount again, plus an additional $50, for a total of $14,175.93. Hattenhauer again rejected this attempted withdrawal.

On May 21, 2014, Hattenhauer sent Noble Roman's an email objecting to Noble Roman's audit. Hattenhauer noted its belief that the audit was based on potential sales, not actual sales; that it did not properly account for Hattenhauer's pricing discounts and waste (that is, product that was prepared but not sold quickly enough and therefore had to be discarded); and that the attempted withdrawals from its bank account were "unethical at best." Dkt. No. 162-22. On June 20, 2014, Noble Roman's sent Hattenhauer a letter stating: "Since you have refused to pay the royalty from the initial audit, we have extended the audit period to encompass your Noble Roman's activity from the time each Noble Roman's location opened through May 2014." The letter also stated that Hattenhauer owed Noble Roman's $62,551.29 in unpaid royalties ($41,022.85 for the Washington location and $21,528.44 for the Oregon location). Hattenhauer again objected, responding in an email that it had reported its sales each week as required and paid royalties accordingly, that the locations had considerable waste, and that Noble Roman's had not provided Hattenhauer with any documentation to support Noble Roman's calculations. Hattenhauer also denied the validity of Noble Roman's audit methodology and stated that it did not consent to any electronic funds transfers based on the audits. On July 17, 2014, Noble Roman's sent an email with the report pages of the SPCs created as a result of the new audit.

On September 23, 2014, Hattenhauer received notice that Noble Roman's had successfully withdrawn $100.09 from Hattenhauer's bank account by electronic funds transfer. Noble Roman's did not give Hattenhauer notice prior to this transfer. Hattenhauer again objected.

On September 24, 2014, Noble Roman's informed Hattenhauer that it had conducted another audit of the Hattenhauer locations for the time period from June 2014 through August 2014, and concluded that Hattenhauer owed an additional $639.26 in unpaid royalties.

On September 29, 2014, Noble Roman's attempted to obtain $539.17 via electronic funds transfer, without notifying Hattenhauer of such transfer, but this attempted transfer was rejected by Hattenhauer's bank.

### E. Facts Relating to Hattenhauer's Discrimination Claim

In 2014, Noble Roman's decided to bill franchisees for royalties with a difference of more than 20% between its estimate, as determined by audit, of a franchisee's sales and a franchisee's reported sales. When a franchisee operated multiple units, Noble Roman's applied the 20% parameter to the average sales difference of the multiple units. The 20% number was an arbitrary number chosen by Noble Roman's. Noble Roman's did not give Hattenhauer a credit for 20% of the sales differences it calculated with its audits; rather, it attempted to collect the entire amount of the difference from Hattenhauer.

Noble Roman's inadvertently failed to bill one of the locations operated by franchisee Village Pantry, LLC, even though its SPCs had a sales difference greater than 20%. Noble Roman's did bill the other two locations operated by the same franchisee.

In 2014, Noble Roman's conducted an audit of franchisee Pic N Save and used a lower menu price for the 14" pizza dough because the franchisee demonstrated that it ran specials on 14" pizzas.[7] The audit calculated a sales difference less than 20%, but the sales difference would have been greater than 20% if Noble Roman's did not take the special pricing into account.

---

[7]In response to this assertion of fact by Hattenhauer, Noble Roman's asserts that "Noble Roman's gave all franchisees the opportunity to have their audits adjusted based on documented facts." Dkt. No. 177 ¶ 16. The evidence cited for that assertion does not support it. There is no evidence that any franchisee was given the opportunity to provide documentation to challenge the factual assumptions made by the auditors. Rather, the deposition testimony cited states that "the pictures [Noble Roman's] had on hand showed that they [Pic N Save] were doing that, and so that was documented as part of the menu price that we took off of the pictures we had, plus what the unit said their prices were." Dkt. No. 177-4 at 6. In fact, Noble Roman's attempted to collect the underpaid royalties it calculated without asking for any input from Hattenhauer, so it

Noble Roman's did not extend the time frame of the audit for most of the franchisees that it audited in 2014.

### III. <u>DISCUSSION</u>

In its Amended Complaint, Noble Roman's asserts a breach of contract claim against Hattenhauer. In response, Hattenhauer asserts counterclaims for breach of contract, violations of the Washington Franchise Investment Protection Act and the Washington Consumer Protection Act, and a claim under the Indiana Crime Victims Relief Act. Both parties move for summary judgment on each of the counterclaims; Hattenhauer seeks summary judgment on Noble Roman's breach of contract claim, and Noble Roman's seeks partial summary judgment as to that claim. Each claim is addressed, in turn, below.

#### A. Noble Roman's Breach of Contract Claim

Noble Roman's alleges that Hattenhauer "knowingly breached the Franchise Agreements by: (1) underreporting Gross Sales; (2) refusing to pay the royalty fees that are directly related to the underreported Gross Sales; and (3) failing to use Noble Roman's brand pizza cheese for its Noble Roman's pizzas at the Oregon Location." Dkt. No. 10-1 at 10. Under Indiana law, which the parties agree applies in this case,

> [t]he construction of the terms of a written contract is a pure question of law . . . . When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the

_____

is difficult to see how Hattenhauer was given the opportunity to provide documentation to support adjustments to its audits.

> contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.

*Whitaker v. Brunner*, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004). Thus, the first step in applying a contract provision is determining whether the provision in question is ambiguous. "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016). A term is not ambiguous solely because the parties disagree about its meaning. *Id.* "'We will not bend the language of a contract to create an ambiguity when none exists, but neither will we follow a literal interpretation when [to do so] would lead to an unreasonable or absurd result.'" *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (quoting *Chicago Bd. of Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)).

Hattenhauer argues that it is entitled to summary judgment on Noble Roman's breach of contract claims related to underpayment of royalty payments because the method used by Noble Roman's to calculate the amount of underpayment was not permitted under the Franchise Agreements. The Court agrees.

Noble Roman's argues that its audit methodology was permitted under the Franchise Agreements because

> The Franchise Agreements require Hattenhauer to preserve its "books, records and accounts, including, but not limited to, daily sales records, sales slips, coupons, purchase orders," etc. The Franchise Agreements also provide that Noble Roman's may audit Hattenhauer's "books and records." Finally, the Franchise Agreements provide that "if an inspection should reveal that such payments have been understated in any report to [Noble Roman's], then [Hattenhauer] shall immediately pay to [Noble Roman's] the amount overdue."

> Combined, these provisions: (1) require Hattenhauer to retain as part of its books and records its purchase orders; (2) provide that Noble Roman's may audit those records; (3) recognize that Noble Roman's may discover an understatement of

> sales; and (4) create an obligation in the franchisee to "immediately pay" the amount due. Under these provisions, Noble Roman's could use the purchase records to determine whether Hattenhauer had understated its Gross Sales, and therefore, its royalty payments. Hattenhauer's contention that the audit must be of, and only of, the reported Gross Sales misses this point; indeed, under Hattenhauer's theory, the contractual requirement that it preserve its "books, records, and accounts," which include purchase orders, would serve no purpose. That is, Hattenhauer would be required to maintain certain records, including purchase orders, but Noble Roman's could not rely on those records to verify the accuracy of Hattenhauer's reported sales. This interpretation must be avoided.

Dkt. No. 159 at 20-21 (citations omitted). This argument ignores the plain language of the Franchise Agreements in several ways. First, as the language quoted above makes clear, the Franchise Agreement provided that Noble Roman's could review *Hattenhauer's* records to determine whether royalty payments had been properly made. But Noble Roman's did not base its calculations on Hattenhauer's records, but rather on the distributor's records. Further, Noble Roman's argument that if Noble Roman's could not rely on Hattenhauer's purchase orders to calculate Hattenhauer's Gross Sales "the contractual requirement that it preserve its 'books, records, and accounts,' which include purchase orders, would serve no purpose" is belied by the contractual language that Noble Roman's elides with its use of "etc." in the passage quoted above. Hattenhauer also was required to maintain other records, such as payroll records and sales tax returns, that would not have been of any assistance to Noble Roman's in assessing Hattenhauer's Gross Sales of Noble Roman's products. *See* Dkt. No. 159 at 22 (explaining why sales tax returns could not be used to audit non-traditional franchisees like Hattenhauer). Therefore, the inclusion of "purchase orders" among the records that Hattenhauer was obligated to maintain and allow Noble Roman's to inspect does not support the conclusion that purchase orders were an acceptable means of determining Gross Sales.

More fundamentally, however, Noble Roman's argument ignores the fact that the Franchise Agreements obligated Hattenhauer to pay royalties on its Gross Sales as that term is

defined in the agreements—the total selling price of all Noble Roman's food items sold by Hattenhauer. Whatever records were reviewed and whatever methodology was used, the end goal should have been to determine the actual amount of Noble Roman's products sold by Hattenhauer. However, in Noble Roman's own words, its audit method was designed to determine "how many products [Hattenhauer] *likely* sold based on [Hattenhauer's] purchases [of ingredients]," Dkt. No. 159 at 23; "an amount of sales that Noble Roman's, based on its decades of experience in the pizza business, *expected to see* based on [its] analysis," *id.*; "the amount of sales that the stores *should have been able to achieve* had they been operating their franchises in accordance with Noble Roman's specified standards that were authorized by the Franchise Agreements," *id.* at 3. *See also* Dkt. No. 186 ("Hattenhauer's two franchise locations should have reported greater sales, per the Franchise Agreements, had they been in accordance with Noble Roman's specified standards."). In other words, Noble Roman's position is that Hattenhauer is obligated to pay royalties on Noble Roman's *estimate* of its Gross Sales. Noble Roman's explains at length why it believes that "[f]or non-traditional locations, such as Hattenhauer's franchise locations, the only feasible way to audit sales after the fact for accurate reporting is by using the record of ingredients purchased," and how its audit method is consistence with Internal Revenue Service guidelines. *See id.* at 22-24. Taking those facts as true for purposes of this ruling, presumably Noble Roman's was aware of that when it drafted the Franchise Agreements and could have defined "Gross Sales" to mean an estimate based on purchase records from the Noble Roman's approved distributor. But it did not. The purchase order unambiguously requires royalties to be paid on Hattenhauer's actual Gross Sales, not an

estimate of those Gross Sales.[8]  By agreeing to this arrangement, Noble Roman's accepted the

risk that Gross Sales might be difficult to track with precision in a "non-traditional" sales

environment; presumably it took that into account when it chose the royalty percentages for its

non-traditional franchisees.  Because the method used by Noble Roman's to determine that

Hattenhauer underreported (and therefore underpaid) its royalties was not permitted by the

Franchise Agreements, Hattenhauer is entitled to summary judgment on Noble Roman's breach

of contract claim based on those alleged underpayments.

Hattenhauer also seeks summary judgment on Noble Roman's claim that Hattenhauer

breached the Franchise Agreements by using non-conforming pizza cheese at its Oregon

location.  As both parties note, under Indiana law, "[t]o prevail on a claim for breach of contract,

the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and

damages resulting from the breach."  *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind.

2012).  Hattenhauer argues that "Noble Roman's cannot establish damages for Hattenhauer's use

of the substituted cheese because Hattenhauer paid royalties on all its gross sales, including its

sales of Noble Roman's pizzas."  Dkt. No. 161 at 34.  Noble Roman's responds:

> The amount of damages inflicted upon Noble Roman's due to Hattenhauer's breach
> will be determined at trial. Moreover, the Franchise Agreement provides for
> additional contractual damages related to this breach including "all damages, costs
> and expenses, including reasonable attorneys' fees, incurred by [Noble Roman's]
> in connection with obtaining any remedy available to [Noble Roman's] for any
> violation of this Agreement."

Dkt. No. 177 at 20.  This argument is insufficient.  Hattenhauer specifically argued that it is

entitled to summary judgment because Noble Roman's did not suffer any damages as a result of

---

[8]Even if the contract were ambiguous on that point, it would be construed against the
drafter, which was Noble Roman's.  *Buskirk v. Buskirk*, 86 N.E.3d 217, 224 (Ind. Ct. App. 2017)
("Generally, an ambiguous contract will be construed against its drafter.") (citing *Fresh Cut, Inc.
v. Fazli*, 650 N.E.2d 1126, 1132 (Ind. 1995)).

Hattenhauer's use of non-conforming cheese.  Because damages is an element of Noble Roman's breach of contract claim, Noble Roman's was then required to demonstrate that there is a genuine issue of fact regarding whether it did, in fact, suffer damages.  It did not even attempt to do so.[9]

In support of its own motion for partial summary judgment, Noble Roman's argues that "the Court can clearly rule on the first two elements of the breach of contract claim but allow a jury to determine the damages element at trial."  Dkt. No. 159 at 13.  This is, of course, true with regard to Noble Roman's own motion, but not helpful in the face of Hattenhauer's motion for summary judgment.  Indeed, this is recognized in one of the cases cited by Noble Roman's, *Norwood Promotional Products, LLC v. KustomKoozies, LLC*, 835 F. Supp. 2d 685, 697 (S.D. Ind. 2011), in which the Court specifically noted that the defendant in that case "did not seek summary judgment on the absence of damages element."  In this case, Hattenhauer did, which obligated Noble Roman's to point to evidence from which a reasonable jury could find that it suffered damages as a result of Hattenhauer's breach.  *See, e.g.*, *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case.  And by evidence, we mean evidence on which a reasonable jury could rely.") (citations omitted).  Because Noble Roman's failed to do so, Hattenhauer is entitled to summary judgment on that

---

[9]Noble Roman's recognizes that the lack of damages is an appropriate issue on which to seek summary judgment in a breach of contract case, as it seeks summary judgment against Hattenhauer on Hattenhauer's breach of contract claim in part because, it argues, Hattenhauer "cannot . . . prove any damages stemming from their alleged breach."  Dkt. No. 159 at 26.

claim as well.  Accordingly, summary judgment is **GRANTED** in favor of Hattenhauer on Noble Roman's breach of contract claim.

### B.  Hattenhauer's Breach of Contract Counterclaim

Hattenhauer alleges that Noble Roman's breached the Franchise Agreements by using an audit method not permitted under the Franchise Agreements to calculate Hattenhauer's Gross Sales and underpaid royalties.  Noble Roman's argues that it is entitled to summary judgment on that issue because its methodology was authorized by the Franchise Agreement.  As discussed above, the Court finds, as a matter of law, that the Franchise Agreements did not permit Noble Roman's to calculate Gross Sales in the manner in which it did.  As Noble Roman's only argument with regard to Hattenhauer's motion for summary judgment on this issue is that the audits it performed were authorized by the Franchise Agreements, the Court finds that Hattenhauer is entitled to summary judgment on this issue.

Hattenhauer also alleges that Noble Roman's successful and unsuccessful attempts to collect what it determined to be unpaid royalties by means of electronic withdrawals from Hattenhauer's bank account constituted a breach of the Franchise Agreements.  Noble Roman's again argues that it is entitled to summary judgment on this claim because its actions were authorized by the Franchise Agreement.  The Court disagrees, both for the reasons set forth above—that is, the royalties Noble Roman's sought to collect were not properly calculated and therefore were not owed to Noble Roman's—and for a separate reason.  Hattenhauer argues, and the Court agrees, that nothing in the Franchise Agreement gave Noble Roman's the right to collect unpaid royalties calculated as a result of an audit by means of electronic withdrawals made without Hattenhauer's consent.

As Noble Roman's correctly notes:

Section XI of the Franchise Agreements provide that "[i]f any required royalty payments to [Noble Roman's] are delinquent, or if an inspection should reveal that such payments have been understated in any report to [Noble Roman's], then [Hattenhauer] shall immediately pay to [Noble Roman's] the amount overdue or understated upon demand with interest determined in accordance with the provisions of Section IV.B.(3)." Section IV of the Franchise Agreements states that "[a]ll unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the 'prime rate' then currently established by the largest bank (determined by total bank assets) headquartered in the state in which the [Noble Roman's and/or Tuscano's] Location is situated."

Dkt. No. 159 at 27 (quoting, *inter alia*, Dkt. No. 1-1 at 17). Noble Roman's acknowledges, as it must, that the Franchise Agreement required Hattenhauer to pay Noble Roman's any understated royalties "on demand." It then argues that it "demanded the payment through initiating an ACH withdraw from Hattenhauer's bank account." *Id.* The Court finds that it is simply not reasonable to interpret the relevant provisions of the Franchise Agreements to permit this unilateral action by Noble Roman's. Section XI of the Franchise Agreements is written in the active voice; it provides that Hattenhauer "*shall immediately pay* to [Noble Roman's] the amount overdue or understated upon demand with interest . . . ." Dkt. No. 1-1 at 16. By contract, Section IV(B), the provision of the Franchise Agreements that relates to automatic withdrawals is, appropriately, written in the passive voice: it provides that royalty fees "shall be due and payable each week based on the Gross Sales for the preceding week . . . and *shall be paid electronically* (draft on Franchisee's bank account by electronic withdrawal) so that it is received by Franchisor on or before Tuesday of each week from a direct draw account set up by Franchisee for purposes of payment of the Royalty Fee." Dkt. No. 1-1 at 4. This distinction makes complete sense. The royalty payments to be paid passively from Hattenhauer's account are those that are calculated from Hattenhauer's own reports of Gross Sales sent to Noble Roman's each week. Hattenhauer thus would know exactly how much would be withdrawn by Noble Roman's and would be able

to ensure sufficient funds were available in its account. Hattenhauer would be denied the ability to control its own bank account balance if amounts unilaterally calculated by Noble Roman's based on an audit that Hattenhauer was unaware of could simply be withdrawn by Noble Roman's. Noble Roman's attempt to collect alleged unpaid royalties from Hattenhauer's bank account without any action on Hattenhauer's part—that is, without making a demand to Hattenhauer and then allowing Hattenhauer to make a payment—was not authorized under the Franchise Agreements and constituted a breach of contract. There is no question that Hattenhauer suffered damages as a result of this breach; at a minimum, Hattenhauer was injured by the fact that Noble Roman's successfully withdrew $100.09 from its bank account in violation of the Franchise Agreements.

Hattenhauer also asserts in its Amended Counterclaim that Noble Roman's breached the Franchise Agreements by "fail[ing] to provide assistance or support to Hattenhauer in its operation of the Washington and Oregon Locations in violation of Section V(7) of the Franchise Agreements." Dkt. No. 142 at 11-12. In two of the Franchise Agreements, Section V(7) reads as follows:

> During the operation of the franchised business, [Noble Roman's will provide] such additional assistance as is reasonably necessary, in the sole discretion of [Noble Roman's], to assist [Hattenhauer] in meeting Noble Roman's quality control standards.

Dkt. No. 1-1 at 6 (applying to pizza franchise at Washington location); Dkt. No. 1-4 at 6 (applying to Oregon location beginning March 21, 2011). In a third Franchise Agreement, Section V(7) is as quoted above except that it omits the word "sole." Dkt. No. 1-2 at 6 (applying to Tuscano's franchise at Washington location). In a fourth Franchise Agreement, which applied to the Oregon location from April 2005 to April 2010, Section V(7) reads:

During the operation of the franchised business, [Noble Roman's will provide] such additional assistance as is reasonably necessary to assist [Hattenhauer] in meeting [Noble Roman's] quality control standards.

Dkt. No. 1-3 at 6.

Noble Roman's moves for summary judgment on this issue, pointing to the language in three of the Franchise Agreements that give Noble Roman's the discretion to determine what assistance is "reasonably necessary." Hattenhauer argues that granting Noble Roman's such discretion creates an illusory promise, and also notes that the discretion language is not present in one of the Franchise Agreements.

The Court need not resolve these issues. Under the plain language of all of the Franchise Agreements, to the extent that the Franchise Agreements required Noble Roman's to provide any "assistance," that assistance was to relate to Hattenhauer's ability to comply with Noble Roman's quality control standards.[10] The only such assistance that Hattenhauer identifies as lacking relates to its use of non-conforming pizza cheese. *See* Dkt. No. 178 at 33-34 (discussing Noble Roman's alleged "fail[ure] to provide particularized assistance to [Hattenhauer] to help it meet [Noble Roman's] quality control standards."). Even assuming that Noble Roman's failed to provide such assistance in violation of the Franchise Agreements, the only way that failure could have damaged Hattenhauer would have been if it were held liable to Noble Roman's for its use of the non-conforming cheese. In light of the fact that the Court has ruled in favor of Hattenhauer on the breach of contract and Lanham Act claims relating to the use of non-

---

[10]Hattenhauer argues that Noble Roman's breached its obligation to "provide assistance" under Section V(7) by failing to inform Hattenhauer in 2009 that it had conducted an audit and determined that Hattenhauer had underreported its Gross Sales. *See* Dkt. No. 187 at 7. Hattenhauer fails to explain how the contractual term at issue—"assist Franchisee in meeting Franchisor's quality control standards"—reasonably can be read to encompass an obligation to inform Hattenhauer of the results of a financial audit. The Court finds that it cannot.

conforming cheese, the Court finds that Hattenhauer has no viable breach of contract claim relating to Section V(7), and therefore Noble Roman's is entitled to summary judgment on that issue.

In summary, Hattenhauer's motion for summary judgment is **GRANTED** with regard to liability on its breach of contract claim relating to Noble Roman's calculation of unpaid royalties and Noble Roman's use and attempted use of electronic withdrawals to collect them. Noble Roman's motion for summary judgment is **GRANTED** as to Hattenhauer's breach of contract claim relating to Noble Roman's alleged failure to provide assistance pursuant to Section V(7) of the Franchise Agreements.

## B. Hattenhauer's Counterclaim under the Indiana Crime Victim's Relief Act

Hattenhauer asserts a counterclaim pursuant to the Indiana Crime Victim's Relief Act ("ICVRA"), which creates a civil cause of action pursuant to which a person who suffers a pecuniary loss as a result of a violation of certain Indiana criminal statutes may recover treble damages, attorney fees, and costs. Hattenhauer alleges that Noble Roman's violated three of the criminal statutes referenced in the ICVRA. First, it alleges that Noble Roman's committed the crime of deception, which is defined, in relevant part, as "knowingly or intentionally mak[ing] a false or misleading written statement with intent to obtain property." Ind. Code § 35-43-5-3(a)(2). The written statements pointed to by Hattenhauer are as follow:

a. Noble Roman's conducted an audit of Hattenhauer's franchise locations;
b. Hattenhauer underreported its sales to Noble Roman's in the amount of $207,799.06 from January 2011 to February 2014;
c. Hattenhauer owed royalty payments of $14,125.93 for its Washington Location to Noble Roman's for January 2011 to February 2014;
d. Noble Roman's conducted an audit of Hattenhauer's franchise locations for the years 2005 or 2006 through May 2014;
e. Hattenhauer underreported its sales to Noble Roman's in the amount of $585,040.65 for the Washington Location for the years 2005 or 2006 to 2014;

f. Hattenhauer underreported its sales to Noble Roman's in the amount of $307,549.16 for the Oregon location for the years 2005 or 2006 to 2014; and

g. Hattenhauer owed royalty payments in the amount of $62,551.29 to Noble Roman's for the years 2005 or 2006 to 2014.

Assuming that these statements satisfy the definition of deception, Hattenhauer has wholly failed to articulate how it suffered pecuniary loss as a result of those statements, stating only that "Noble Roman's relied on those statements when it successfully withdrew money from Hattenhauer's account." Dkt. No. 161 at 48. There is no allegation that Noble Roman's made those statements to Hattenhauer's bank in order to induce it to release funds to Noble Roman's, and Hattenhauer certainly was not misled by the statements into authorizing the release of funds to Noble Roman's. Deception cannot be the basis for a claim under the ICVRA in this case for the simple reason that Hattenhauer was not deceived by any of Noble Roman's statements.

Hattenhauer also alleges that Noble Roman's committed conversion and criminal trespass when it successfully withdrew funds from Hattenhauer's bank account. Indiana Code § 35-43-2-2(b)(4) provides that a person who "knowingly or intentionally interferes with the possession or use of the property of another person without the person's consent" commits criminal trespass. Criminal conversion is defined as "knowingly or intentionally exert[ing] unauthorized control over property of another person." Ind. Code § 35-43-4-3(a). Both of those crimes are referenced in the ICVRA.

Noble Roman's does not address conversion in its motion for summary judgment or in its response to Hattenhauer's motion for summary judgment, even though Hattenhauer addresses it. *See, e.g.*, Dkt. No. 161 at 46-47 ("Noble Roman's committed the crimes of deception, criminal trespass, and criminal conversion against Hattenhauer, causing Hattenhauer's pecuniary loss."). Noble Roman's also does not address Indiana Code § 35-43-2-2(b)(4), but instead inexplicably discusses Indiana Code § 35-43-2-2(b)(2), which expressly applies only to trespass on real

24

property. Noble Roman's argues that Hattenhauer "cannot prove the *mens rea* required to support their allegation of an Indiana CVRA violation" because "[r]elying upon the Franchise Agreements, Noble Roman's believed that the amount of unpaid royalty fees discovered in the audits was immediately due and owing." Dkt. No. 159 at 33-34. However, as Noble Roman's acknowledges in its brief, the belief that one is authorized to possess the property at issue must have a "fair and reasonable foundation" in order to "defeat the mens rea requirement of the criminal trespass statute." *Id.* at 34 (quoting *Larsen v. Fort Wayne Police Dep't*, 825 F. Supp. 2d 965, 978 (N.D. Ind. 2010) (citing *Taylor v. State of Indiana*, 836 N.E.2d 1024, 1028 (Ind. Ct. App. 2006)) and citing *Olsen v. State*, 663 N.E.2d 1194, 1196 (Ind. Ct. App. 1996)). As discussed at length above, there is simply no provision in the Franchise Agreements that reasonably can be said to authorize Noble Roman's to make the electronic withdrawal that it made—that is, that it had the right to exercise control over Hattenhauer's money, rather than to pursue legal action to recover what it believed it was owed by Hattenhauer. In other words, the Court has determined as a matter of law that the contract cannot reasonably be interpreted to provide authorization for Noble Roman's electronic withdrawal of funds from Hattenhauer's account based on the result of its audits. This is especially true in light of the fact that by the time Noble Roman's made its successful withdrawal, Hattenhauer had made it abundantly clear that it did not consent to the withdrawals and disputed Noble Roman's audit process.

The Court finds that Hattenhauer has established as a matter of law that Noble Roman's withdrawal of $100.09 from Hattenhauer's bank account constituted conversion as defined by

Ind. Code § 35-43-4-3(a).  Accordingly, Hattenhauer is entitled to summary judgment as to liability on its claim under the ICVRA.[11]

### C. Hattenhauer's Counterclaim under the Washington Consumer Protection Act

In its Amended Counterclaim, Hattenhauer asserts separate claims pursuant to the Washington Franchise Investment Protection Act ("WFIPA"), Wash. Rev. Code Ann. 19.100.190(3), and the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code Ann. 19.86.090.  In its summary judgment briefing, however, Hattenhauer argues that Noble Roman's breached its duty of good faith and fair dealing, which is imposed on all franchise agreements pursuant to Wash. Rev. Code Ann. § 19.100.180, by (1) calculating royalties in the way that it did; (2) withdrawing funds from Hattenhauer's bank account; (3) failing to give Hattenhauer a "credit" for a 20% variance between the Gross Sales calculated by Noble Roman's and the Gross Sales reported by Hattenhauer; (4) extending the timeframe covered by the audits when Hattenhauer refused to pay; and (5) failing to provide training and updated manuals in a timely manner.  Hattenhauer then argues that "[w]hen a franchisor commits any of the acts prohibited by Section 19.100.180, including discrimination between franchisees and bad faith conduct, the franchisor commits an unfair or deceptive act or practice under the Consumer Protection Act. Wash. Rev. Code Ann. § 19.100.180; Wash. Rev. Code Ann. 19.100.190(1)."  Dkt. No. 161 at 49.  It therefore seeks to recover damages under the WCPA.

As it relates to Hattenhauer's allegations of bad faith, this argument is without merit. Section 19.100.190(1) provides that "[t]he commission of any unfair or deceptive acts or practices or unfair methods of competition prohibited by RCW 19.100.180 as now or hereafter

_____

[11]In light of this finding, the Court need not determine whether the withdrawal also constituted criminal trespass.

amended shall constitute an unfair or deceptive act or practice under the provisions of [the

WCPA]." As Noble Roman's points out, Section 19.100.180 provides a list of things that are

"an unfair or deceptive act or practice or an unfair method of competition." Acting in bad

faith—or, more precisely, violating the duty of good faith—is not one of them. Even assuming

that the actions pointed to by Hattenhauer constitute bad faith, they do not violate the WCPA by

operation of Wash. Rev. Code Ann. 19.100.190(1). While perhaps Hattenhauer could

demonstrate that the actions taken by Noble Roman's constitute an "unfair or deceptive act"

under the WCPA, it has not done so in its briefs, and "[i]t is not this court's responsibility to

research and construct the parties' arguments." *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir.

2011).

Hattenhauer also alleges the Noble Roman's treated it differently than its other non-

traditional franchisees by: (1) arbitrarily "determin[ing] that if there was a difference of more

than 20% between its inaccurate estimates for potential sales and a franchisee's reported sales,

then the franchisee must be underreporting"; (2) inconsistently applying the 20% parameter; (3)

extending the time frame of its audit of Hattenhauer but not most of its other franchisees; and (4)

failing to take Hattenhauer's discounts and specials into account, while doing so for Pic N Save.

Dkt. No. 161 at 50-51. Discrimination between franchisees is a listed unfair or deceptive act

under the WFIPA and therefore under the WCPA. *See* Wash. Rev. Code Ann. 19.100.180(2)(c).

That fact alone is not sufficient to establish a violation of the WCPA, however. "To succeed on

a CPA claim, a plaintiff must establish (1) an unfair or deceptive act (2) in trade or commerce (3)

that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5)

a causal link between the unfair or deceptive act complained of and the injury suffered." *Trujillo*

*v. Nw. Tr. Servs., Inc.*, 183 Wash. 2d 820, 834-35 (2015). Noble Roman's argues that

Hattenhauer cannot demonstrate the requisite effect on the public interest.[12] The Court agrees.

In a case under the WCPA, "a plaintiff can establish that the lawsuit would serve the

public interest by showing a likelihood that other plaintiffs have been or will be injured in the

same fashion." *Id.* Hattenhauer alleges that this element is satisfied in this case because Noble

Roman's has applied its unauthorized audit method to its many franchisees and taken many of

the other actions that form the basis of Hattenhauer's bad faith claim against other franchisees.

Hattenhauer does not explain how the acts of discrimination it alleges satisfy this element,

however. Hattenhauer has not provided any evidence that Noble Roman's has or is likely to

discriminate against other franchisees in the manner in which it allegedly discriminated against

Hattenhauer. Indeed, Hattenhauer's discrimination claim is based on Hattenhauer's allegation

that Noble Roman's treated it *differently* than it treated its other franchisees. Accordingly, Noble

---

[12]Noble Roman's also argues that the Court should consider the fact that Hattenhauer raised these claims with the State of Washington, Department of Financial Institutions, Securities Division ("Department") and that the Department "concluded that there was no Franchise Act violation by Noble Roman's." Dkt. No. 177 at 28. This is not an accurate statement of the Department's findings; it actually stated that "Based on the fact that there is insufficient information to establish a Franchise Act violation and that the complainant currently is involved in litigation regarding the subject matter of the complaint, I am closing the file at this time." Dkt. No. 159-5. Hattenhauer's argument that the Court cannot consider Dkt. No. 159-5 because it is "inadmissible hearsay" misses the mark. Dkt. No. 178 at 43. For summary judgment purposes, "hearsay" is not a sufficient objection; rather, the objection must be that the fact at issue "cannot be presented in a form that would be admissible in evidence." Federal Rule of Civil Procedure 56(c)(2). Hattenhauer does not suggest that Dkt. No. 159-5 does not accurately reflect the Department's action with regard to its complaint; therefore, there is no reason to believe that its conclusion could not be presented in an admissible form, *i.e.*, pursuant to the business records exception or by testimony from the Department. The more appropriate objection is that the Department's determination is simply not relevant, which Hattenhauer also argues. The Department's conclusion clearly was based on the information it had before it, and therefore that conclusion simply is not relevant to the Court's inquiry, which must be based on the evidence of record in this case. Noble Roman's suggestion that this statement is entitled to *Chevron* deference is wholly without merit. *See generally Arobelidze v. Holder*, 653 F.3d 513 (7th Cir. 2011) (illustrating the limited application of *Chevron*).

Roman's is entitled to summary judgment on Hattenhauer's claims under the WCPA and the WFIPA.[13]

## IV. CONCLUSION

For the reasons set forth above, Noble Roman's motion for partial summary judgment (Dkt. No. 158) is **GRANTED** as to Hattenhauer's counterclaims under the WCPA and the WFIPA and as to Hattenhauer's counterclaim relating to Section V(7) of the Franchise Agreements.  It is **DENIED** in all other respects.  Hattenhauer's motion for summary judgment (Dkt. No. 160) is **GRANTED** as to all of Noble Roman's claims and **GRANTED** as to liability as to all of Hattenhauer's counterclaims except its claims under the WCPA and the WFIPA and its claims relating to Section V(7) of the Franchise Agreements, on which it is **DENIED**.

The parties shall confer and file a notice setting forth how they wish to proceed in this case—specifically, whether a trial is necessary on the issue of Hattenhauer's damages—**within 28 days of the date of this Entry.**  The Court encourages the parties to contact the Magistrate Judge to request a settlement conference in this case if they believe it would be useful.

SO ORDERED: 3/30/18

William T. Lawrence

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

---

[13]The Court also notes that Hattenhauer has not demonstrated that it suffered injury as a result of the alleged acts of discrimination.  The only injury articulated by Hattenhauer is Noble Roman's unauthorized withdrawal of funds from its bank account.  *See* Dkt. No. 161 at 54 ("Hattenhauer suffered an injury sufficient to maintain its CPA claim because Noble Roman's 'unlawfully retained possession of funds to which' Hattenhauer is entitled.").  But this is not related to any act of discrimination between franchisees; Hattenhauer would have suffered this injury even if Noble Roman's treated all of its franchisees in the same manner as it treated Hattenhauer.